IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 1, 2021

**IN RE OCTAVIA C., ET AL.**

**Appeal from the Juvenile Court for Madison County**
**No. 59-53260          Christy R. Little, Judge**

_____

**No. W2021-00575-COA-R3-PT**

_____

This appeal involves a petition to terminate parental rights. The juvenile court found by clear and convincing evidence that several grounds for termination as to the mother were proven: (1) abandonment by failure to support; (2) abandonment by failure to provide a suitable home; (3) abandonment by an incarcerated parent for failure to support; (4) abandonment by an incarcerated parent for wanton disregard; (5) substantial noncompliance with a permanency plan; (6) persistent conditions; (7) severe child abuse; and (8) failure to manifest an ability and willingness to care for the children. The juvenile court also found that termination was in the best interests of the children. The mother appeals. On appeal, the Department of Children's Services does not defend the grounds of abandonment by failure to support and abandonment by failure to establish a suitable home. We reverse the juvenile court in part and affirm in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed in Part and Affirmed in Part**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and FRANK G. CLEMENT, JR., P.J., M.S., joined.

Alexander D. Camp, Jackson, Tennessee, for the appellant, Betty J. R.

Herbert H. Slatery, III, Attorney General and Reporter, and Kathryn A. Baker, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.          FACTS & PROCEDURAL HISTORY**

Betty J. R. ("Mother") is a parent to four children: Octavia, Oz, Odessa, and Onyca. The children all have different fathers, apart from Odessa and Onyca, who are twins and share a father. This appeal only concerns the termination of Mother's parental rights as to Octavia, Odessa, and Onyca. Oz exited custody through a permanent guardianship with his paternal grandmother during the pendency of this case. Additionally, although the juvenile court terminated the parental rights of both Mother and the father of the twins, only Mother appeals.

In March 2018, the Department of Children's Services ("DCS") became involved with the family after receiving a report regarding the children that alleged environmental neglect and drug exposure. As a result, child protective services investigator ("CPSI") Bridgett Love-Morgan visited the home to discuss the allegations with Mother. During the visit, Mother submitted to a urine drug screen and tested positive for methamphetamine. CPSI Morgan also observed that the home was cluttered and in disarray: there were dirty clothes and bags of dirty clothes piled on the floors; the home lacked a working washer and dryer; the refrigerator was broken; the children ate on the floors due to a lack of chairs in the kitchen; the living room contained a couch without cushions; the children were sleeping on bare mattresses on the floor; the home lacked running hot water; and a space heater was observed running in one of the rooms that contained clutter. Furthermore, one of the twins was observed with an untreated burn on her arm, and Octavia had what appeared to be a staph infection due to a spider bite. Following this visit, the juvenile court entered an emergency protective custody order placing the children in DCS custody on March 4, 2018. The juvenile court found that there was probable cause to believe that the children were dependent, neglected, or abused based upon the sworn testimony of CPSI Morgan concerning drug-exposure and environmental neglect. Thereafter, on March 6, 2018, DCS filed a petition to adjudicate dependency and neglect, and for temporary custody. The children entered foster care.

In April 2018, the initial permanency plan was developed. After a hearing in June 2018, the juvenile court ratified the initial permanency plan. The responsibilities relevant to Mother were listed as the following:

1. Obtain legal income and stable housing to provide for the children;
2. Attend services through the Wo/Men's Resource and Rape Assistance Program ("WRAP") and follow recommendations;
3. Submit to hair follicle, urine, and oral drug screens;
4. Complete a mental health assessment with an alcohol and drug ("A&D") component and follow recommendations; and
5. Complete parenting classes and follow recommendations. [1]

---

[1] The permanency plans in the record contain several additional statements in the "Action Step(s)" which are obviously not responsibilities of any of the named parents (such as providing services and conducting background checks). Therefore, we have referenced only those statements which are actually

Additionally, Mother was responsible for attending visits, providing for her children's basic needs at those visits, and informing DCS or the provider if she was running late or cancelling a visit. The goals of this initial permanency plan were to return to parent or exit custody with relatives. Mother also signed the DCS form setting forth the criteria and procedures for termination of parental rights. On April 10, 2018, the juvenile court entered a preliminary hearing order setting a combined preliminary, adjudicatory, and dispositional hearing. In addition to the requirements already set forth in the permanency plan, the juvenile court ordered Mother to: submit to hair follicle drug testing; submit to a mental health assessment with an A&D component; submit to random drug screens; submit to homemaker services; submit to in-home services; obtain employment with an income sufficient to provide for her needs and the needs of her children; have supervised visits with her children; and have no contact with her former paramour. The order also noted that Mother was a potential candidate for the new safe baby court ("SBC") in Madison County, and if she agreed to participate, all of her scheduled court hearings and reviews would be heard in SBC. Mother agreed to participate and subsequently signed up for SBC.[2] During the month of April, Mother submitted to an oral swab drug screen and a hair follicle drug screen, both of which resulted in her testing positive for methamphetamine and amphetamine.

Following Mother's agreement to participate in SBC, there was a series of SBC orders entered over the course of the next few months. Throughout these orders, the juvenile court noted Mother's progress, added new requirements, and reiterated the requirements not yet completed. In the first SBC order entered in May 2018, the juvenile court noted that Mother did not currently have transportation and a working phone. Furthermore, Mother reported that she did not have suitable clothing for herself and that her last employment was ten years ago with Waffle House. Mother also reported that she received a government check for the twins and supplemented her income with odd jobs. The juvenile court ordered Mother to: comply with all DCS services, court-ordered services, and SBC services; obtain and maintain employment; obtain and maintain stable housing; submit to an A&D assessment and follow all recommendations; submit to hair follicle drug screens; have supervised visits with her children; and complete a mental health assessment and follow all recommendations. Additionally, the Tennessee Early Intervention System ("TEIS") was to evaluate the twins due to their behaviors, counseling or therapy would be sought for Octavia due to her exhibiting self-harming behaviors, and DCS was to provide Mother with bus passes to assist with transportation. Many of the requirements here overlapped with the requirements already set forth in the preliminary hearing order from April 2018.

---

the responsibility of Mother.
[2] The preliminary hearing occurred on March 6, 2018, but the order from that hearing was not entered until April 10, 2018. Prior to that order being entered, Mother agreed to participate in SBC on March 20, 2018, as evidenced by the first SBC order.

In June 2018, the juvenile court entered an adjudicatory and dispositional hearing order. Pursuant to Tennessee Code Annotated sections 37-1-129 and 37-1-130, the juvenile court found that DCS carried the burden of proof that the children were dependent and neglected and ordered the children to remain in DCS custody. The juvenile court's finding of dependency and neglect was based on the fact that Mother, through her counsel, stipulated to illegal drug use and environmental concerns. The juvenile court noted that Mother completed her A&D assessment, which recommended that she attend an intensive outpatient program ("IOP"). Thereafter, the juvenile court entered another SBC order noting that Mother began her IOP classes, but she left half-way through the program and missed the remainder of her classes. The juvenile court also noted that Mother had not yet obtained employment or housing. The juvenile court stated that Mother's counsel "sternly admonished her client that she need[ed] to find employment and housing and to get 'busy' complying." The second permanency plan was developed in October 2018 and ratified in November 2018. Mother also signed the DCS form setting forth the criteria and procedures for termination of parental rights again. Among other things, the second permanency plan noted that at the time Mother had steady employment and stable housing, had completed services through WRAP, had beds for all of the children, had completed an A&D assessment, had completed an IOP with verification of completion, and was currently enrolled in parenting classes with two classes left to complete. The second permanency plan also noted that the family continued to maintain a bond.

In November 2018, the juvenile court entered more SBC orders that continued to note Mother's progress, add new requirements, and reiterate the requirements not yet completed. The juvenile court noted that Mother was now engaged, had stable housing at the time, was having visits with the children, and had produced a negative drug screen on July 9, 2018. In a subsequent order, the juvenile court permitted Mother to begin unsupervised visitation on the weekends. The juvenile court entered another order which noted that Mother had ultimately completed an IOP in August 2018. In December 2018, the juvenile court entered an order noting that Mother now had a part-time job but had tested positive for methamphetamine on her hair follicle drug screen on September 20, 2018. As a result, Mother's unsupervised visitation on the weekends was temporarily suspended. However, due to a decrease in levels from the previous hair follicle result in April 2018, Mother was given the benefit of the doubt and allowed to resume her unsupervised visitation on the weekends.

In January 2019, Mother obtained a rental home. In February 2019, the children began a trial home visit with Mother. Prior to the start of the trial home visit, Mother submitted to a urine drug screen and was negative for illegal drugs. In April 2019, DCS filed a motion for review raising concerns regarding the trial home visit. A visit was made to the home on April 3, 2019, and Mother submitted to a drug screen. Mother's drug screen results were negative; however, there was a faint line for methamphetamine. DCS requested an extension of the trial home visit and not a disruption. Therefore, the juvenile

court entered an order extending the visit for forty-five days past the May 1, 2019 expiration date, which established the new expiration date as June 16, 2019. The juvenile court entered a subsequent order noting that Mother had tested positive for methamphetamine on April 8, 2019. While the drug screen results were concerning, at the time DCS was not willing to disrupt the trial home visit or extend the trial home visit expiration date beyond June 16, 2019. On June 5, 2019, Mother submitted to a urine drug screen and tested positive for methamphetamine again. Mother submitted to a second urine drug screen and tested negative. Afterward, Mother refused to submit to an oral swab drug screen. Due to Mother's drug screen results, the juvenile court ordered that Mother would submit to an oral swab drug test and that the children would submit to hair follicle drug testing. Mother submitted to her oral swab drug test on June 6, 2019, and the results received on June 13, 2019 were positive for amphetamine and methamphetamine. On June 18, 2019, after Oz, Odessa, and Onyca all tested positive for methamphetamine, the trial home visit ended. Thereafter, DCS filed a motion to modify the order for disruption of the trial home visit, and a petition to adjudicate dependency, neglect, and severe abuse. After a hearing in August 2019, the juvenile court entered an amended adjudicatory and dispositional order finding that the four children were dependent and neglected, and that Oz, Odessa, and Onyca were victims of severe child abuse perpetrated by Mother.

In July 2019, the third permanency plan was developed. After a hearing in August 2019, the juvenile court ratified the third permanency plan. The responsibilities relevant to Mother were the following:

1. Address budgeting and homemaking (cleaning and schedule for the children);
2. Obtain her driver's license;
3. Complete an A&D assessment and attend inpatient treatment for substance use;
4. Submit to random urine and oral drug screens as well as hair follicle drug screens;
5. Obtain employment, provide a check stub, and obtain housing;
6. Continue to receive services through CASA to help with chore/behavioral chart for the children, and participate in family counseling; and
7. Complete services for substance abuse recommended by her psychological evaluation with parenting assessment.

Additionally, the third permanency plan noted that Mother had completed her psychological evaluation with a parenting assessment in May 2019, and her parenting classes in June 2019. The third permanency plan also noted that Mother was currently homeless and living with her sister. A few months later, the fourth permanency plan was developed in October 2019. After a hearing in January 2020, the juvenile court ratified the fourth permanency plan. The responsibilities relevant to Mother were the following:

1. Obtain housing and address budgeting and homemaking (cleaning and schedule for the children);
2. Schedule an appointment to receive an A&D assessment due to her admitting not

being able to stay in Jackson treatment program;

3. Complete mental health assessment due to her reporting being depressed and having anxiety issues; and
4. Comply with hair follicle, urine, and oral drug screens.

Additionally, the fourth permanency plan noted that visitation had stopped due to Mother's behavior. The fourth permanency plan also noted that Mother was currently homeless and living with friends. The goals in this permanency plan were changed to adoption and exit custody with relative. In January 2020, Mother was incarcerated after she was charged with aggravated burglary. She was not released until March 2020. In April 2020, the fifth permanency plan was developed. After a hearing in June 2020, the juvenile court ratified the fifth permanency plan. The responsibilities relevant to Mother were the following:

1. Complete a new A&D assessment to determine what services were needed;
2. Finish counseling recommended by her mental health assessment;
3. Submit to a hair follicle drug screen and comply with random urine and oral drug screens;
4. Obtain housing and address budgeting and homemaking (cleaning and schedule for the children);
5. Resolve all of her legal problems and follow any rules that are given after her court date; and
6. Participate in supervised visitation with the children over the phone.

On April 21, 2020, DCS filed a petition for termination of parental rights on several grounds as to Mother: (1) abandonment by failure to visit; (2) abandonment by failure to support; (3) abandonment by failure to provide a suitable home; (4) abandonment by an incarcerated parent for failure to support; (5) abandonment by an incarcerated parent for wanton disregard; (6) substantial noncompliance with a permanency plan; (7) persistent conditions; (8) severe child abuse; and (9) failure to manifest ability and willingness to assume custody. On June 18, 2020, Oz exited custody through a permanent guardianship with his paternal grandmother. On July 8, 2020, the juvenile court entered its order awarding permanent guardianship of Oz to his paternal grandmother. Also in July 2020, the court-appointed special advocate ("CASA"), Dr. Karen J. Wood, submitted a report recommending termination of Mother's parental rights. In that report, Dr. Wood described her observations of Mother's home during the trial home visit:

> While visiting in the home when the children were still with [Mother], it was obvious that the atmosphere in the home was very chaotic. Given this family's history, I think it is safe to assume that chaos has been the rule for all the children all their lives. When I say chaotic, I am referring to several different aspects of the home. The physical arrangement was cluttered and frequently filthy. There would be clothes and trash everywhere; food left in dishes, on the table and on the floor. Everyday things typical in most homes

were absent or occurred haphazardly. The three younger children (ages 3 and 4 at the time) would be the only ones up when I would come to the home at 9am. At 11am, they would not have had breakfast. Octavia, then 12, would be up half the night playing games on her phone.

Possibly the most disturbing aspect of the chaos was that nothing positive in the home was ever permanent or predictable. The children never knew what was expected of them or what to expect from the adults in the home in response to their behaviors. Children of all ages need some way to make sense of what is going on around them. They need something to bring order out of the chaos. In most homes, the adults set the structure, establish the expected behaviors, model appropriate behaviors, reinforce the child[ren]'s positive behaviors, and correct any inappropriate behaviors. All of this was missing in [Mother's] home.

Additionally, Dr. Wood stated that Mother was never able to accomplish consistency, lacked concern for the children's overall development, was unable to execute any of the plans she developed or follow through on any recommendations given by others, and continued to blame "the system" for illegally keeping her children from her. Dr. Wood also noted that Octavia had admitted that she did not want to be happy in foster care because she was afraid Mother would think she was betraying her. Dr. Wood explained that "[a]lthough Octavia has continued to have her struggles during much of this time, she finally seems to have found a place where she too is allowed to be a child without the worry of caring for her younger siblings or helping her mother try to keep the household together." Thus, Dr. Wood concluded that "[i]t seems to be only fair that these children be allowed to get on with their lives and leave [Mother] to deal with her problems and issues without further derailing theirs."

In September 2020, Mother filed a response to the petition, wherein she issued a "blanket denial" as to all of the grounds for termination alleged by DCS. Mother requested that the petition be dismissed, that DCS be required to continue working with Mother and her children, and that a goal of the permanency plan be amended to return to parent and/or exit with a next of kin/relative. The sixth and final permanency plan was developed in September 2020 and ratified in October 2020. The responsibilities relevant to Mother were the following:

1. Submit to a new hair follicle drug screen and comply with random urine and oral drug screens;
2. Provide DCS with the recommendations from her new mental health assessment;
3. Obtain housing and address budgeting and homemaker services for cleaning and schedules for the children;
4. Complete a new A&D assessment;
5. Set up classes for an IOP;

6. Visit with Oz at the discretion of his foster mother;

7. Resolve all legal problems and follow any rules that are given after her court date.

In October 2020, Dr. Wood submitted another report recommending termination of Mother's parental rights. In that report, Dr. Wood stated that "[t]hese three girls[, Octavia, Odessa, and Onyca,] deserve the right to get on with their lives without the continued interference from random, infrequent, dramatic, and, therefore, devastating contacts with their mother." In January 2021 and March 2021, Dr. Wood again submitted reports recommending termination of Mother's parental rights and reiterating what she stated in her previous reports.

The petition for termination of parental rights was set to be heard in January 2021; however, the juvenile court granted Mother's motion to continue after she received ambiguous text messages regarding the cancellation of the hearing. Thereafter, on March 5, 2021, the juvenile court held trial on the petition for termination of parental rights. Mother was not present for the trial. Ms. Tashyra Williams testified as the family service worker for DCS in this case. Ms. Williams's role included addressing issues for the permanency of custody and the well-being of the children. Ms. Williams explained that the children entered DCS custody for drug exposure after Mother tested positive for methamphetamine. However, there were also environmental concerns: clothing and food all in the home; problems with the water; a space heater in the home where one of the children had burned herself and the burn had not been treated; Octavia had to be treated for staph infection; and the children were sleeping on mattresses in the living room. Furthermore, the space heater in the cluttered house and a broken-in porch floor at the entrance of the home created a hazardous and unsafe environment. Ms. Williams testified that the environmental concerns alone would have been enough to remove the children because the home was a danger to the children. Ms. Williams concluded that this was much more than just bad housekeeping: it was not a good situation.

Throughout DCS's involvement with this family, there were a total of six permanency plans. In her testimony, Ms. Williams appropriately described the purpose of a permanency plan: "It's the roadmap to get the children home and for us to make sure their safety, well-being, and permanency is taken care of." As a roadmap, the permanency plans included requirements that Mother was asked to complete in order to position herself as capable of having her children returned to her. Ms. Williams summarized some of Mother's requirements that were ordered by the juvenile court, many of which overlapped with the requirements of the permanency plans: submit to a hair follicle drug test; submit to a mental health assessment with an A&D component; submit to random drug screens; submit to homemaker services; submit to in-home services; obtain employment with income sufficient to provide for her needs and the needs of her children; have supervised visits with her children; have no contact with her paramour; comply with DCS services, court-ordered services, and SBC services; obtain housing and maintain stable housing; submit to an A&D assessment and follow recommendations; allow TEIS to evaluate the

twins due to their behaviors; and allow Octavia to seek counseling and therapy due to her self-harm and behaviors. She testified that DCS was making reasonable efforts toward a permanent and appropriate placement for the children and toward preventing the children from continuing in foster care unnecessarily. Among other things, DCS provided for the children's medical, dental, and mental needs, monitored the children's education and daycare needs, provided counseling, offered bus passes to Mother for transportation, assisted with Mother's A&D assessment and her IOP, and helped facilitate visitation.

As for Mother's housing situation, Ms. Williams testified that Mother lived in a hotel for approximately three months after she was evicted from her home in March 2018. At one point, Mother was asked to contact the Care Center for housing assistance. However, the Care Center required a negative drug screen, and Mother could not go because she admitted that she would test positive for marijuana. Mother was also asked to contact the Jackson Housing Authority for housing assistance, but she had an outstanding utility bill that prevented her from this option. Mother eventually found housing with her new boyfriend who paid all of the bills. In the beginning of his involvement with Mother, the boyfriend submitted to a urine screen and tested negative, and participated in some of the SBC hearings. Afterward, Ms. Williams testified that DCS was preparing to begin a trial home visit, but Mother moved to a hotel again for a month after failing to pay an outstanding utility bill. According to Ms. Williams, DCS tried to pay the outstanding utility bill, but Mother would not give DCS the bill because it was in her boyfriend's name. Due to Mother's recurring housing instability, the trial home visit was delayed until February 2019. Ms. Williams explained that Mother had obtained a rental home in January 2019. Ms. Williams testified that the Guardian ad litem went to this home and found it appropriate, but it needed some additional furniture. Mother was able to find this needed furniture without assistance from DCS. Ms. Williams testified that the home was clean and that Mother had beds for the children. Thus, the trial home visit with the children began in February 2019.

Ms. Williams testified that during the trial home visit, DCS received a referral in April 2019 for a drug-exposed child, and Mother submitted to a hair follicle drug screen and tested positive for methamphetamine. However, Mother had claimed that she used methamphetamine prior to the trial home visit and that is why she tested positive, so DCS extended her grace. DCS then received another referral in June 2019 for a drug-exposed child, the children submitted to hair follicle drug screens, and Mother submitted to an oral swab drug screen. Mother, Oz, Oncya, and Odessa all tested positive for methamphetamine. Therefore, the trial home visit ended in June 2019, and Mother was later evicted from her rental home because she failed to make the utility payments. Ms. Williams testified that Mother had not had a home of her own since then. Ms. Williams explained that Mother went to her sister's home, then to a friend's home, and she now lived in Minnesota with a friend. Ms. Williams testified that she had not had an opportunity to video call Mother and scan the home in order to determine if it was appropriate. Ms. Williams found out about Mother's move to Minnesota through one of the foster mothers.

Because Mother's current home was out of state, Ms. Williams explained that DCS would need go through the Interstate Compact for the Placement of Children ("ICPC") in order for someone to go to the home in Minnesota and inspect it. According to Ms. Williams, this would not have been completed by the time the trial was held, but Ms. Williams admitted that this effort was not made by DCS and that it was not Mother's fault. Ms. Williams also admitted that it was not fair to Mother to move forward without inspecting her home in Minnesota to determine whether an adjustment to her circumstance, conduct, or conditions had been made. However, Ms. Williams explained that DCS was relieved of efforts as far as reunification with Mother after the trial home visit was disrupted, which influenced DCS's decision to not complete the ICPC.

As for Mother's employment, Ms. Williams testified that Mother neither provided a check stub confirming employment, nor any income or support from her alleged jobs to help with her children's care. Ms. Williams explained that in the three years she had been involved with this family, she had not received any confirmation of employment or stable income from Mother. According to Ms. Williams, Mother claimed to have worked several jobs during DCS's involvement with the family: a phone sex operator; a receptionist at a moving company; an employee with a sitting company; and an employee with a cleaning service. At one point, Mother also claimed to have been involved with an online training program to become a reservationist. Despite these claims, DCS never received verification of Mother's employment. Ms. Williams testified that Mother did not have transportation, so DCS gave her bus passes to seek employment, attend visitation, and participate in her IOP. Therefore, Ms. Williams stated that there should not have been any excuse for Mother not to seek a job. Although Mother had bus passes, Ms. Williams offered transportation at one point in order for Mother to complete certain requirements such as WRAP and hair follicle drug screens, but Ms. Williams also continued to give her the opportunity to complete these things on her own. Ms. Williams testified that Mother did ultimately obtain her Tennessee driver's license to help with the transportation issue, which was a requirement of her permanency plan.

As for visitation, Ms. Williams testified that Mother attended supervised biweekly visitation from March 2018 to February 2019, which was the period between removal and the trial home visit. During that period, Mother was allowed to begin unsupervised visitation every other weekend in August 2018. Mother's unsupervised visitation was temporarily suspended due to her still testing positive for methamphetamine in September 2018. However, Mother's levels had decreased from her last hair follicle drug screen, and therefore, she was given the benefit of the doubt and allowed to resume her unsupervised visits with the children. After the trial home visit ended in June 2019, Ms. Williams set up supervised visits for two months, which Mother failed to attend. Mother then called in August 2019 about supervised visits, and Ms. Williams set up those visits for September. Ms. Williams testified that Mother attended these, but disruptions occurred at each of the three visits. At the first visit, Mother cursed at the staff and blamed them for the children reentering DCS custody. At the second visit, Octavia would not sit, was upset with Mother

that the children had reentered DCS custody, and got into an argument with Mother that led to the visit being stopped. At the third visit, Ms. Williams spoke with Mother about her A&D assessment outside, and Mother came back inside upset. Mother told everyone she was leaving and told the children not to trust DCS. As a result, Ms. Williams explained that a no-contact order was entered in October 2019 until Mother could behave. However, Mother was still allowed to contact the children through phone calls. Ms. Williams testified that Mother still talked to Octavia and would call the twins' foster mother from time to time to check on the children. Mother also mailed something to the twins in January 2021. Other than this mail, Ms. Williams testified that Mother had not provided gifts or presents to the children since 2019.

As for Mother's progress, Ms. Williams testified that Mother completed her first A&D assessment and an IOP before the trial home visit. However, after the trial home visit, Mother failed to complete her second A&D assessment and attempted a second IOP twice but left within twenty-four hours. Therefore, according to Ms. Williams, Mother had not really had any treatment for her methamphetamine addiction. Ms. Williams testified that Mother repeatedly tested positive for methamphetamine. Mother tested positive for methamphetamine on March 4, 2018; April 10, 2018; April 20, 2018; September 20, 2018; April 8, 2019; June 5, 2019; and June 6, 2019. Mother produced negative drug screens on July 9, 2018 and prior to the start of the trial home visit. Ms. Williams testified that Mother completed her WRAP assessment, but she did not qualify for the program because her situation was not a current emergency. The WRAP assessment recommended that Mother complete counseling for her past PTSD, but she refused to attend the counseling. Ms. Williams also testified that Mother completed her mental health assessment, completed her parenting classes, and obtained her driver's license.

Ms. Williams explained that DCS had difficulty contacting Mother, but Mother was eventually able to find a phone that worked and DCS was then able to contact her. However, Ms. Williams testified that she still had communication issues with Mother. According to Ms. Williams, Mother had expressed an interest in having her children returned to her and objected to any filing of termination. Mother further thought it was in the best interest of the children for them to be with her. When Ms. Williams disagreed with her, Mother responded by cursing Ms. Williams, stating that she did not know what she was talking about, and stating that DCS was trying to trap her children. Ms. Williams testified that her concerns were that Mother was still using drugs, DCS was not aware of Mother having housing, DCS did not know if Mother's current home was safe and who was in any such home, there was uncertainty if Mother was working and if she could care for the children, and their only contact with Mother since the filing of the petition for termination was by telephone. Furthermore, Ms. Williams was especially concerned about placing Octavia back in the home with Mother due to the drug exposure and the potential sexual abuse from Mother's boyfriends. Emphasizing the importance of terminating Mother's parental rights, Ms. Williams concluded that "[w]e've been going through this for three years and [Mother] has failed to produce a negative drug screen. We've had

inconsistent housing for three years. It's just a cycle . . . the kids would be returning to custody in Minnesota because she's living with a friend. It's not her home."

Ms. Williams testified about her observations regarding the children's behavior. As for the twins, it was initially recommended that TEIS evaluate them due to their behaviors. At nearly three-years-old, the twins were not communicating, threw tantrums from ten minutes to an hour during foster care placements, and could keep the behavior going on for hours. Ms. Williams explained that because the twins were beyond the appropriate age for the TEIS, DCS contacted their school to inquire about an individualized education program ("IEP") for the twins for pre-kindergarten. However, Mother would not follow through with the necessary paperwork so DCS had a difficult time completing the IEP. Mother also failed to show up at the school to complete an intake with the twins' counselor. The IEP appointment was rescheduled, Ms. Williams took Mother to the appointment, and one of the twins' appointments was completed. Ms. Williams testified that the twins also had problems at school: they would tear things up, throw things, not comply with the teachers' directions, and not follow rules. At one point, the twins were suspended from school, and DCS took them out of school and sought counseling for them. Ms. Williams stated that on another occasion DCS could not get their behaviors under control for a month-and-a-half after they saw Mother, and counseling was sought as a result. Onyca was also having severe behavior issues where she was sticking things up her nose. DCS had to take Onyca to the doctor three times because of this behavior. Ms. Williams testified that the twins participated in play therapy. Ms. Williams physically observed a majority of the therapy sessions because she transported the twins to most of them. There were still significant problems with the twins throwing tantrums during play therapy. The twins would have to participate in the sessions together because it would cause problems when they were separated, but the play therapy was attempting to do one at a time to develop one-on-one skills. Ms. Williams testified that "[w]e started seeing progress with them communicating and [the play therapy] stated that a lot of the concerns that they were seeing with the tantrums were parenting issues. So building boundaries and sticking to your discipline and consequences was what was needed." Ms. Williams concluded that the twins needed a lot of help.

As for Octavia, Ms. Williams described her as the caregiver for the children as the oldest sibling, and for this reason, she had never had the opportunity to be a child. Ms. Williams testified that it was recommended Octavia complete counseling for self-harming behavior. Ms. Williams explained that Octavia would threaten to harm herself, drink the ink out of pens, and was upset about being in foster care. Ms. Williams explained that Octavia did not want to be in foster care because she believed the unfortunate remarks Mother made about DCS: DCS was against her, DCS was lying, and DCS took her from Mother. Ms. Williams testified that Octavia also had mental health issues: she had changes in her mood; she was receiving treatment for depression and anxiety; she stated that she hears voices that tell her to do things; she threatened to harm her foster mother; she was defiant and would not follow any rules; she did not want to do chores and was hard to

parent. Moreover, Ms. Williams testified that Octavia was failing in school because she was not trying or was not doing her work. However, Ms. Williams testified that Octavia's current foster mother was getting her behaviors under control because Octavia had complied with some of the chores that were asked of her.

Ms. Williams testified that all four children were originally placed in foster care with one foster family. After the trial home visit ended, Octavia and Oz were placed together in a second foster home, and the twins were placed together in a second foster home with their current foster mother. The twins have remained in their foster mother's home since then, and although the problems with their behaviors have continued, the foster mother was still willing to keep and adopt the twins. Octavia and Oz remained together in their second foster home until May 2020. Octavia then went to live in a third foster home and stayed there until August 2020. Afterward, Octavia went to live in a fourth foster home and has remained there since then. Ms. Williams testified that the children saw each other at least once a month. Ms. Williams explained that Octavia had everyone's phone number, so she was able to contact the foster parents. Ms. Williams testified that she saw the children at least twice a month, has personally observed the twins in the foster mother's home, believes it is a safe home, and has seen the twins interact with their foster mother. Ms. Williams also testified that the twins' foster mother wanted to adopt the twins, and she believed it would be in the best interest of the children to terminate Mother's parental rights as to the twins and make them eligible for adoption. Ms. Williams explained that the twins were stable and bonded there, the foster mother loved them, it would harm them psychologically to have to leave, and they were now cooperating in school. When asked if the twins express anything about Mother, Ms. Williams testified that they did not. As for Octavia, Ms. Williams testified that she was concerned about placing her back in the home with Mother because it was overwhelming for Octavia. Ms. Williams explained that, although Octavia desired to go back home, she was still afraid that Mother was going to have boyfriends there who might sexually abuse her, which had happened in the past. Ms. Williams testified that although Octavia had expressed this interest in going home, she was conflicted because she was afraid Mother has not changed. Ms. Williams concluded that Octavia was stable in her current placement, she was not moving from home to home, and she was not afraid of people sexually abusing her there. Ms. Williams testified that this would change if Mother's parental rights were not terminated. Ms. Williams explained this was a problem because Octavia then would have hope that she would still get to go home and that may not happen.

The twins' foster mother testified at trial. At the time of trial, the twins' foster mother had fostered the them for nearly two years. During that period, she had the opportunity to speak with Mother from time to time. She explained that the twins' bad behavior was minimal now due to less contact with Mother. She also explained the twins were concerned as to why Mother was unhappy and upset when they would speak with Mother. She described the twins' behavior as better and well-adjusted. The twins' foster mother, whom the twins called "Nana," testified that the twins were part of the family and

that she was willing to adopt them.

On April 20, 2021, the juvenile court entered a final order terminating parental rights and a final decree of full guardianship. The juvenile court found by clear and convincing evidence that several grounds for termination as to Mother were proven: (1) abandonment by failure to support; (2) abandonment by failure to provide a suitable home; (3) abandonment by an incarcerated parent for failure to support; (4) abandonment by an incarcerated parent for wanton disregard; (5) substantial noncompliance with a permanency plan; (6) persistent conditions; (7) severe child abuse; and (8) failure to manifest an ability and willingness to care for the children.[3] Mother timely filed her notice of appeal on May 19, 2021.

## II.    ISSUES PRESENTED

Mother presents the following issue for review on appeal, which we have slightly restated:

1.  Whether the trial court erred when it found that DCS met the burden of proof for termination of parental rights by clear and convincing evidence.

For the following reasons, we reverse the juvenile court in part and affirm in part.

## III.    STANDARDS APPLICABLE TO TERMINATION CASES

"A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016). "No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Kaliyah S.*, 455 S.W.3d 533, 556 (Tenn. 2015). Nevertheless, parental rights are not absolute. *In re Carrington H.*, 483 S.W.3d at 522.

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d at 546. Pursuant to this statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, the petitioner must prove the existence of at least one of the statutory grounds for termination set forth in Tennessee Code Annotated section 36-1-113(g). *Id.* Second, the petitioner must prove that termination of parental rights is in the best interest of the child under the factors set forth in Tennessee Code Annotated section 36-1-113(i). *Id.* Due to the constitutional dimension of the rights at stake, the petitioner seeking termination must prove both elements by clear and convincing evidence. *In re*

---

[3] Due to the no-contact order against her that prevented her from visiting the children, DCS voluntarily dismissed the ground of abandonment by failure to visit as to Mother.

*Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *see* Tenn. Code Ann. § 36-1-113(c). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings." *Id.* (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *State, Dep't of Children's Servs. v. Mims (In re N.B.)*, 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008)).

Because of this heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d at 861. We review the trial court's factual findings de novo in accordance with Rule 13(d) of the Tennessee Rules of Appellate Procedure, presuming each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d at 524. We then make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). Regarding conclusions of law, "[t]he trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. DISCUSSION

### A. Grounds for Termination Against Mother

On appeal, Mother presents the sole issue of whether the trial court erred when it found that DCS met the burden for termination of parental rights by clear and convincing evidence.[4] In accordance with *In re Carrington H.*, we "review the trial court's findings

---

[4] Mother's brief cursorily addresses the several grounds for termination, providing only two sentences under the heading for "Statutory Grounds for Termination." Mother's brief is devoid of any material discussion as to the grounds for termination. Courts have routinely held that an issue is waived where a brief fails to make appropriate references to the record, cite to relevant authority in the argument, or, *at the very least*, fashion an argument. *Burton v. Barna*, No. M2015-00132-COA-R3-CV, 2016 WL 769545, at *2 (Tenn. Ct. App. Feb. 26, 2016) (citing *Bean v. Bean*, 40 S.W.3d 52, 55 (Tenn. Ct. App. 2000)). "Tennessee Rule of Appellate Procedure 27(a) requires an appellant's brief to include an argument that sets forth 'the contentions of the appellant with respect to the issues presented, and the reasons therefore, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . .'" *In re Mya V.*, No. M2016-02401-COA-R3-PT, 2017 WL 3209181, at *3 (Tenn. Ct. App. July 28, 2017) (quoting Tenn. R. App. P. 27(a)(7)(A)). However, due to the exception carved out by the Tennessee Supreme Court, "in an appeal from an order terminating parental rights [we] must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26. We have stated before that the practice employed by Mother's counsel "stretch[es] the supreme court's intention [in *In re Carrington H.*] to its outer limit." *In re Mya V.*, 2017 WL 3209181, at *3. Lawyers are obligated to act as zealous advocates on behalf of their clients, *see generally* Tenn. Sup. Ct. R. 8, RPC 8(3), and the desire of *In re Carrington H.* was not to

- 15 -

as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26.

### 1. Abandonment by Failure to Support
### Tenn. Code Ann. §§ 36-1-113(g)(1) & 36-1-102(1)(A)(i)

Pursuant to Tennessee Code Annotated section 36-1-113(g)(1), one ground for termination exists if a parent has abandoned his or her child. There are several alternative definitions of abandonment, which are set forth in Tennessee Code Annotated section 36-1-102(1)(A).

DCS states that it does not defend the ground of abandonment by failure to support pursuant to Tenn. Code. Ann. § 36-1-102(1)(A)(i). We therefore reverse the trial court's finding as to this ground. *See In re Colton B.*, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *6 (Tenn. Ct. App. Oct. 29, 2018) *perm. app. denied* (Tenn. Jan. 22, 2019) ("[W]hen the petitioner who sought termination has conceded on appeal that a ground was not sufficiently proven, this Court has, in several cases, reversed the trial court's finding as to that ground without reaching the merits of whether the ground was actually established."); *In re Zane W.*, No. E2016-02224-COA-R3-PT, 2017 WL 2875924, at *7 (Tenn. Ct. App. July 6, 2017) *perm. app. denied* (Tenn. Sept. 26, 2017) (reversing a ground that DCS "does not defend" and noting that *In re Carrington H.* "has never been construed to require this Court to also consider the grounds sustained by the trial court and thereafter conceded or waived by the non-parent on appeal").

### 2. Abandonment by Failure to Provide a Suitable Home
### Tenn. Code Ann. §§ 36-1-113(g)(1) & 36-1-102(1)(A)(ii)

DCS also states that it does not defend the ground of abandonment for failure to provide a suitable home pursuant to Tenn. Code. Ann. § 36-1-102(1)(A)(ii). We therefore reverse the trial court's finding as to this ground. *See In re Colton B.*, 2018 WL 5415921, at *6; *In re Zane W.*, 2017 WL 2875924, at *7.

### 3. Abandonment by an Incarcerated Parent
### Tenn. Code Ann. §§ 36-1-113(g)(1) & 36-1-102(1)(A)(iv)

---

sanction any reduction of that obligation. Rather, it was to "advance the important goal of concluding parental termination litigation as rapidly as possible 'consistent with fairness.'" *In re Carrington H.*, 483 S.W.3d at 525 (citing *Lassiter v. Dep't of Soc. Servs. of Durham Cty., N.C.*, 452 U.S. 18, 32 (1981); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003)). Therefore, as we have done in the past, we caution against the use of the Tennessee Supreme Court's holding in this manner. *See In re Artemas A.*, No. W2021-00058-COA-R3-PT, 2021 WL 4352540, at *8 n.7 (Tenn. Ct. App. Sept. 24, 2021); *In re Edward R.*, No. M2019-01263-COA-R3-PT, 2020 WL 6538819, at *6 n.3 (Tenn. Ct. App. Nov. 6, 2020); *In re Yariel S.*, No. E2016-00937-COA-R3-PT, 2017 WL 65469, at *6 (Tenn. Ct. App. Jan. 6, 2017).

In addition to the definitions of abandonment already discussed, a third alternative definition of abandonment is provided under Tennessee Code Annotated section 36-1-102(1)(A) as:

(iv) A parent . . . is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent . . . of the child who is the subject of the petition for termination of parental rights or adoption, or a parent . . . has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has:

(*a*) Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding the parent's or guardian's incarceration;

(*b*) Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child during an aggregation of the first one hundred twenty (120) days of non-incarceration immediately preceding the filing of the action; or

(*c*) Has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv)(*a*)-(*c*).  We have "indicated that the above definition 'contains multiple ways of abandonment for termination of parental rights.'" *In re Navada N.*, 498 S.W.3d 579, 598 (Tenn. Ct. App. 2016) (citing *In re Kierra B.*, No. E2012-02539-COA-R3-PT, 2014 WL 118504, at *8 (Tenn. Ct. App. Jan. 14, 2014)).  We have explained that incarceration is a condition precedent for this definition of abandonment:

[A]bandonment by an incarcerated parent may only apply where the parent . . . "is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent . . . has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding."

*Id.* (citing Tenn. Code Ann. § 36-1-102(1)(A)(iv)).  "[T]he parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct . . . ." *In re Audrey S.*, 182 S.W.3d at 866.  We have further explained that while "parental incarceration is a strong indicator that there may be problems in the home that threaten the [children's] welfare," it "is not an infallible predictor of

- 17 -

parental unfitness." *Id.*

Under this definition of abandonment, the juvenile court found that DCS met its burden in proving the ground of abandonment by an incarcerated parent both for failure to support and for wanton disregard. DCS breaks these two tests into separate grounds in its brief on appeal, but alleged them together as one ground in the petition. The juvenile court addressed the tests together as one ground under abandonment by an incarcerated parent. Out of an abundance of caution, we review the failure to support and wanton disregard as separate grounds under this particular definition of abandonment. *See In re Navada N.*, 498 S.W.3d at 591 n.8 ("In an abundance of caution, we review each definition of abandonment alleged in the petition and found by the trial court."). The petition, testimony, and CASA reports reflected that Mother was arrested and incarcerated for aggravated burglary. Mother was arrested and incarcerated in January 2020, and she was released in March 2020. The petition for termination was filed on April 21, 2020. Thus, Mother was incarcerated during part of the four consecutive months immediately preceding the filing of this petition.

We now review whether Mother failed to support her children for four consecutive months immediately preceding her incarceration. Tenn. Code Ann. § 36-1-102(1)(A)(iv)(*a*). At the outset of DCS's involvement with this family, Mother reported that her last employment was ten years ago with Waffle House. According to Ms. Williams, Mother claimed to have worked several jobs during DCS's involvement with the family: a phone sex operator; a receptionist at a moving company; an employee with a sitting company; and an employee with a cleaning service. Despite these claims, DCS never received verification of Mother's employment at any time during its three years of involvement with this family. In a CASA report from October 2020, Dr. Wood noted that Mother had stated on several occasions that she wanted to start paying child support. However, Dr. Wood further noted that there was no record of any payments or any arrangements to begin payments. Throughout DCS's involvement with this family, Mother was consistently required and reminded to obtain employment with an income sufficient to provide for her needs and her children's needs. In July 2019, approximately five months before the applicable four-month period, the third permanency plan noted that Mother still needed to obtain employment and provide a check stub in order to verify her employment. Following this reminder, Mother did not report that she had obtained employment until around April 2020, which was after her incarceration and after the subject petition was filed. Ms. Williams testified that there should not have been any excuse for Mother not to seek a job because DCS provided her with bus passes. Ms. Williams testified that, to her knowledge, Mother had not provided any income or support from her various alleged jobs to help with her children's care. The juvenile court credited the testimony of Ms. Williams. "Because the trial court is able to observe witnesses as they testify, appellate courts afford deference to the trial court's credibility assessments of live, in-court testimony." *Phillips v. Hatfield*, 624 S.W.3d 464, 474 (Tenn. 2021) (citing *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014); *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783-84 (Tenn. 1999)). Given

- 18 -

Ms. Williams' testimony concerning Mother's continual failure to obtain employment, provide employment verification, and provide income and support for her children, we find that Mother failed to support her children. Mother has failed to provide financial support for her children since DCS became involved in March 2018, which includes the four months immediately preceding her incarceration in January 2020. Therefore, we affirm the juvenile court's finding that DCS met its burden of proof on the ground of abandonment by an incarcerated parent for failure to support.

We now review whether Mother engaged in conduct prior to her incarceration that exhibited a wanton disregard for the welfare of the children. Tenn. Code Ann. § 36-1-102(1)(A)(iv)(*c*). We have explained that the determination of whether a parent engaged in conduct prior to incarceration exhibiting wanton disregard is not limited to the four consecutive months immediately preceding the incarceration. *See In re Audrey S.*, 182 S.W.3d at 871 ("If parental conduct which exhibits wanton disregard for the welfare of a child can constitutionally form a ground for the termination of parental rights, it would appear to be of no moment whether that conduct occurred during the four months immediately preceding the parent's incarceration or at some earlier point in time."). We have also explained the scope of wanton disregard as follows:

> "Wanton disregard" is not a defined term. Acts amounting to wanton disregard typically "reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015). So "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005).

*In re Kaelyn R.*, No. E2020-01254-COA-R3-PT, 2021 WL 3878597, at *4 (Tenn. Ct. App. Aug. 31, 2021). Not only did Mother engage in criminal behavior that led to her incarceration in January 2020, but Mother also repeatedly tested positive for methamphetamine. Mother tested positive for methamphetamine on March 4, 2018, April 10, 2018, April 20, 2018, September 20, 2018, April 8, 2019, June 5, 2019, and June 6, 2019. Mother's substance abuse led to three of her children being exposed to and testing positive for methamphetamine during the trial home visit. Similar to our holding in *In re Kaelyn R.*, we find that there is clear and convincing evidence that supports the juvenile court's finding that Mother's pre-incarceration conduct exhibited wanton disregard for the welfare of her children. *Id.* at *5. Therefore, we affirm the juvenile court's finding that DCS met its burden of proof on the ground of abandonment for wanton disregard.

## 4. Substantial Noncompliance with a Permanency Plan
## Tenn. Code Ann. § 36-1-113(g)(2)

A parent's rights may be terminated for substantial noncompliance with the statement of responsibilities in a permanency plan. Tenn. Code Ann. § 36-1-113(g)(2). "Tennessee law requires the development of a plan of care for each foster child and further requires that the plan include parental responsibilities that are reasonably related to the plan's goal." *In re Jamel H.*, No. E2014-02539-COA-R3-PT, 2015 WL 4197220, at *7 (Tenn. Ct. App. July 13, 2015) (citing Tenn. Code Ann. § 37-2-403(a)(2)(A)). To terminate a parent's parental rights under this ground, the parent's noncompliance with the plan must be substantial, and the plan's requirements must be "reasonable and related to remedying the conditions which necessitate[d] foster care placement." *In re Valentine*, 79 S.W.3d at 547. "In the context of the requirements of the permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *Id*. at 548. "Determining whether a parent has substantially complied with a permanency plan involves more than merely counting up the tasks in the plan to determine whether a certain number have been completed and 'going through the motions' does not constitute substantial compliance." *In re Carrington H.*, 483 S.W.3d at 537 (citing *In re Valentine*, 79 S.W.3d at 547).

There were six permanency plans developed throughout DCS's involvement with this family. We briefly summarize Mother's requirements from those plans as follows: submit to hair follicle, urine, oral drug screens; obtain a stable and safe home; address budgeting and homemaking; obtain employment and provide a check stub; attend WRAP services and follow recommendations; complete a mental health assessment with an A&D component and follow recommendations; complete parenting classes and follow recommendations; obtain driver's license; resolve legal problems and follow any rules that are given after her court date; and participate in supervised visitation with the children. Given that environmental neglect and drug exposure were the conditions that necessitated foster care placement, we find that these requirements were reasonable and related to remedying those conditions. *In re Valentine*, 79 S.W.3d at 547.

Foremost, Mother submitted to many of her drug screens, but she repeatedly tested positive for methamphetamine. This demonstrated that she failed to remain drug free. During the trial home visit, Mother's substance abuse led to three of her children being exposed to and testing positive for methamphetamine. Consequently, Mother failed to care for her children without abusing drugs, and her failure to remain drug free caused her children to be exposed to the dangers of methamphetamine. Additionally, Mother failed to obtain a stable and safe home. Due to Mother's recurring housing instability, the trial home visit was delayed until February 2019. Mother obtained a rental home in January 2019, but after the trial home visit ended in June 2019, Mother was evicted from her rental home for failing to make the utility payments. Ms. Williams testified that Mother had not had a home of her own since then. Ms. Williams explained that Mother went to her sister's

home, then to a friend's home, and lived in Minnesota with a friend at the time of trial. As for employment, Ms. Williams testified that Mother provided neither a check stub confirming employment nor any income or support from her alleged jobs to help with her children's care. Ms. Williams explained that in the three years she had been involved with this family, she had not received any confirmation of employment or stable income from Mother. According to Ms. Williams, Mother claimed to have worked several jobs during DCS's involvement with the family: a phone sex operator; a receptionist at a moving company; an employee with a sitting company; and an employee with a cleaning service. Despite Mother's claims, DCS never received verification of her employment.

As for visitation, Ms. Williams testified that Mother attended supervised biweekly visitation from March 2018 to February 2019, which was the period between removal and the trial home visit. After the trial home visit ended in June 2019, Ms. Williams set up supervised visits for two months, which Mother failed to attend. In August 2019, Mother called about supervised visits, and Ms. Williams set up those visits for September. Ms. Williams testified that Mother attended these, but disruptions occurred at each of the three visits. As a result, Ms. Williams explained that a no-contact order was entered in October 2019 until Mother could behave.

The third permanency plan noted that Mother had completed a psychological evaluation with a parenting assessment in May 2019, and her parenting classes in June 2019. Ms. Williams testified that Mother ultimately completed her mental health assessment, completed her parenting classes, and obtained her driver's license. Ms. Williams also testified that Mother completed her first A&D assessment and an IOP before the trial home visit. However, after the trial home visit, Mother failed to complete her second A&D assessment and attempted a second IOP twice but left within twenty-four hours. Therefore, according to Ms. Williams, Mother had not really had any treatment for her methamphetamine addiction. Ms. Williams testified that Mother completed her WRAP assessment, but she refused to attend the recommended counseling for her past PTSD. Moreover, communication was an issue. Mother obtained a phone which lessened the communication difficulty between her and DCS, but Ms. Williams testified that she still had communication issues with Mother. Ms. Williams testified that in one instance Mother cursed at her, stated that she did not know what she was talking about, and stated that DCS was trying to trap the children. In another instance, Mother made disparaging remarks about DCS to Octavia: DCS was against her, DCS was lying, and DCS took her from Mother. Furthermore, Mother was arrested and incarcerated in January 2020 for aggravated burglary.

Although Mother completed some of the things required of her, Mother failed to remain drug free, exposed her children to methamphetamine, failed to obtain a stable and safe home, failed to obtain and maintain employment, and failed to provide verification of her employment. Additionally, Mother failed to complete her second A&D assessment and a second IOP, refused to participate in counseling for her PTSD, was difficult to

communicate with, was disruptive at visitations, and incurred criminal charges for aggravated burglary.  On several occasions, DCS gave Mother the benefit of the doubt, extended her grace, and allowed her to have second chances to comply with the requirements.  Given the degree of Mother's noncompliance and the weight of these requirements, we find that Mother's noncompliance was substantial.  Therefore, we affirm the juvenile court's finding that DCS met its burden on the ground of substantial noncompliance with the permanency plan.

### 5.  Persistent Conditions
### Tenn. Code Ann. § 36-1-113(g)(3)

The fourth ground for termination at issue on appeal is commonly known as "persistent conditions."   This ground for termination applies when:

(3)(A) The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

(iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Tenn. Code Ann. § 36-1-113(g)(3).  Each element must be proven by clear and convincing evidence.  *In re Valentine*, 79 S.W.3d at 550.  This Court has stated that this ground applies "when, by court order, a 'child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months' as a result of a dependency and neglect petition." *In re Boston G.*, No. M2019-00393-COA-R3-PT, 2020 WL 2070399, at *6 (Tenn. Ct. App. Apr. 29, 2020); *see also In re D.V.*, No. E2018-01438-COA-R3-PT, 2019 WL 1058264, at *5 (Tenn. Ct. App. Mar. 6, 2019) ("The child must have been

removed from the home or the physical or legal custody of a parent/guardian for a period of six (6) months by a court order entered following a petition alleging that the child is a dependent and neglected child.").

The children were initially removed from Mother's custody on March 4, 2018, pursuant to the juvenile court's emergency protective custody order placing the children in DCS custody, finding probable cause that the children were dependent, neglected, or abused based upon the sworn testimony of CPSI Morgan concerning drug-exposure and environmental neglect. Thereafter, on March 6, 2018, DCS filed a petition to adjudicate dependency and neglect, and for temporary custody. In June 2018, the juvenile court entered an adjudicatory and dispositional hearing order. Pursuant to Tennessee Code Annotated sections 37-1-129 and 37-1-130, the juvenile court found that DCS carried the burden of proof that the children were dependent and neglected, and ordered the children to remain in DCS custody. The juvenile court's finding of dependency and neglect was based upon the fact that Mother, through her counsel, stipulated to illegal drug use and environmental concerns. In February 2019, the children began a trial home visit with Mother. On June 18, 2019, after Oz, Odessa, and Onyca all tested positive for methamphetamine, the trial home visit ended. DCS filed a petition for termination of parental rights on April 21, 2020.

Mother failed to remedy the conditions that led to the removal of her children. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(i). Mother failed to address her substance abuse. Mother repeatedly tested positive for methamphetamine. During the trial home visit, Mother's substance abuse led to three of her children being exposed to and testing positive for methamphetamine. Ms. Williams testified that Mother completed her first A&D assessment and her IOP before the trial home visit. However, after the trial home visit, Mother failed to complete her second A&D assessment, and attempted a second IOP twice, but left each time within twenty-four hours. Therefore, according to Ms. Williams, Mother had not really had any treatment for her methamphetamine addiction. Additionally, Mother failed to address her housing. The children were removed from Mother's home in March 2018 due to environmental concerns that posed a danger to the children. Due to Mother's recurring housing instability afterward, the trial home visit was delayed until February 2019. After the trial home visit ended in June 2019, Mother was evicted from her rental home for failing to make the utility payments. Ms. Williams testified that Mother had not had a home of her own since then. Ms. Williams explained that Mother went to her sister's home, then to a friend's home, and she now lived in Minnesota with a friend. Before the filing of the petition on April 21, 2020, Mother had more than two years to remedy these conditions. Nearly a year later, on March 5, 2021, the juvenile court held a trial on the petition for termination of parental rights, and the suitability of Mother's housing still remained unaddressed. Thus, we find that there is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent in the near future. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii).

- 23 -

Furthermore, continuing Mother's relationship with the children would greatly diminish their chances of early integration into a safe, stable, and permanent home. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii). When the twins came into DCS custody, they exhibited problematic behavior. Ms. Williams testified that the twins also had problems at school. At one point, the twins were suspended from school, and DCS took them out of school and sought counseling for them. Ms. Williams stated that on another occasion DCS could not get their behaviors under control for a month-and-a-half, and counseling was sought as a result. Specifically, Onyca was having severe behavior issues where she was sticking things up her nose. After the twins participated in play therapy, Ms. Williams testified that they had made noticeable progress with their behaviors. Ms. Williams concluded that the twins needed a lot of help. Ms. Williams explained that the twins were now stable and have bonded with their foster mother, their foster mother loved them, it would harm them psychologically to have to leave, and they were now cooperating in school. As for Octavia, Dr. Wood noted that Octavia had admitted that she did not want to be happy in foster care because she was afraid Mother would think she was betraying her. Ms. Williams testified that she was concerned about placing Octavia back in the home with Mother because it was overwhelming for Octavia. Ms. Williams explained that Octavia desired to go back home, but she was still afraid that Mother was going to have boyfriends there and that she might be sexually abused since that had occurred in the past. Ms. Williams testified that although Octavia had expressed this interest in going home, she was conflicted because she was afraid Mother has not changed. Ms. Williams concluded that Octavia was stable in her current placement, she was not moving from home to home, and she was not afraid of people sexually abusing her. Ms. Williams testified that that would change without termination, because Octavia would have hope that she would still get to go home and that may not happen. Dr. Wood reported that Octavia "finally seems to have found a place where she too is allowed to be a child without the worry of caring for her younger siblings or helping her mother try to keep the household together." Dr. Wood stated that Mother failed to set the structure, establish the expected behaviors, model appropriate behaviors, reinforce the children's positive behaviors, and correct any inappropriate behaviors. According to Dr. Wood, chaos had been the rule for all of the children for all of their lives. Moreover, Mother was unable to consistently provide housing for the children, let alone for herself, throughout DCS's involvement. For these reasons, we find that continuing the parent-child relationship would greatly diminish the children's chances of early integration into a safe, stable, and permanent home.

This Court has explained that a trial home visit does not return custody to the parent, but only temporary, physical custody. *See In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *16 (Tenn. Ct. App. Oct. 13, 2008) (holding that the trial home visit did not return custody of the child to the mother). The juvenile court clarified this in the order terminating parental rights stating that it found in actuality there had only been one custodial episode for the children. DCS inadvertently stated that there had been two custodial episodes because of the trial home visit. Even if that was not the case, we would still find that the children were removed from Mother's custody for a period of six months

accruing on or before the first date the termination of parental rights petition was set to be heard. Tenn. Code Ann. § 36-1-113(g)(3)(B). As such, we affirm the juvenile court's finding that DCS met its burden on the ground of persistent conditions.

### 6. Severe Child Abuse
### Tenn. Code Ann. §§ 36-1-113(g)(4) & 37-1-102(b)(27)

A parent's rights may be terminated when "[t]he parent . . . has been found to have committed severe child abuse, as defined § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights . . . to have committed severe child abuse against any child." Tenn. Code Ann. § 36-1-113(g)(4). In January 2021, the juvenile court entered an order finding that Octavia, Oz, Odessa, and Onyca suffered from abuse and/or neglect. The juvenile court also found that Oz, Odessa, and Onyca were victims of severe child abuse, as defined by Tennessee Code Annotated section 37-1-102(b)(27), perpetrated by Mother due to methamphetamine exposure. As this Court has explained, "a trial court may rely on a prior court order finding severe child abuse and is not required to re-litigate the issue of severe abuse during the termination trial." *In re Alexis S.*, No. M2018-00296-COA-R3-PT, 2018 WL 6267180, at *10 (Tenn. Ct. App. Nov. 30, 2018); *see In re Samaria S.*, 347 S.W.3d 188, 201 (Tenn. Ct. App. 2011); *State, Dep't of Children's Servs. v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn. Ct. App. Mar. 8, 2005). Therefore, we affirm the juvenile court's finding that DCS met its burden of proof on the ground of severe child abuse.

### 7. Failure to Manifest an Ability & Willingness to Care for the Children
### Tenn. Code Ann. § 36-1-113(g)(14)

A ground for termination exists when "[a] parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]" Tenn. Code Ann. § 36-1-113(g)(14). Under this statutory ground, there are two elements necessary to prove. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). The first element "places a conjunctive obligation on a parent . . . to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *Id.* at 677. Accordingly, "clear and convincing proof that a parent . . . has failed to manifest either ability or willingness" satisfies the first element of this ground. *Id.* (adopting *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June 20, 2018)). A parent's ability to assume custody or financial responsibility is evaluated based "on the parent's lifestyle and circumstances." *In re Zaylee W.*, No. M2019-00342-COA-R3-PT, 2020 WL 1808614, at *5 (Tenn. Ct. App. Apr. 9, 2020) (citing *In re Ayden S.*, 2018 WL 2447044, at *7). It is common for parents to state that they are willing to assume custody or financial responsibility for their children. However, as we have explained, "[w]hen evaluating willingness, we look for more than

mere words." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). The second element requires the petitioner to establish that "placing the child in the [parent's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]" Tenn. Code Ann. § 36-1-113(g)(14); *see In re Neveah M.*, 614 S.W.3d at 677.

Mother's children were placed in DCS custody in March 2018. After three years, Mother did not yet have the ability to assume custody at the time of trial. Mother did not have a suitable home of her own at the time of trial, and had not had a home of her own since she was evicted from her rental home in June 2019. Mother had ample time, but she failed to establish a safe, stable, and drug-free home and failed to address her substance abuse. Moreover, Mother demonstrated that she was unable to financially support her children by failing to obtain employment and provide verification of that employment throughout DCS's involvement with this family. While Mother thought it was in the best interest of the children for them to be with her, Mother failed to demonstrate through her actions that she was willing to assume custody or financial responsibility for the children.

Furthermore, the record demonstrates that placing the children in Mother's custody would pose a risk of substantial harm to the physical or psychological welfare of the children. According to Ms. Williams, Mother had not really had any treatment for her methamphetamine addiction. Mother's substance abuse was an ongoing issue throughout DCS's involvement, and one that led to three of her children being exposed to methamphetamine. Ms. Williams testified that the twins had made noticeable progress with their behaviors since being removed from Mother's custody. The twins' foster mother explained that the twins' behavioral issues were minimal now due to their having less contact with Mother. She described the twins' behavior as better and well-adjusted. Ms. Williams testified that she was concerned about placing Octavia back in the home with Mother because it was overwhelming for Octavia. Ms. Williams explained that Octavia was conflicted in her desire to go back home because she was still afraid that Mother was going to have boyfriends there and that she might be subjected to sexual abuse again. Ms. Williams concluded that Octavia was stable in her current placement. According to Ms. Williams, placing the children back in the home with Mother would be returning them to a "cycle" of what they had previously been through. Moreover, from her observations during the trial home visit, Dr. Wood stated that Mother failed to set the structure, establish the expected behaviors, model appropriate behaviors, reinforce the children's positive behaviors, and correct any inappropriate behaviors. Dr. Wood opined that chaos had been the rule for all of the children for all of their lives. Octavia finally had a chance to be a child, and was not burdened with caring for her younger siblings or helping Mother try to keep the household together. For these reasons, we agree that returning the children to Mother would pose a substantial risk to the welfare of the children.

Therefore, we affirm the juvenile court's finding that DCS met its burden of proof on the ground of failure to manifest an ability and willingness to assume legal and physical

custody or financial responsibility of the children.

## B. *Best Interests of the Children*

We now review whether termination of Mother's parental rights was in the best interests of the children. This Court "must consider nine statutory factors listed in Tennessee Code Annotated § 36-1-113(i)." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). "The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878. We view the children's best interests from the children's perspective rather than the parent's perspective. *Id.* Finally, we "must consider all of the statutory factors, as well as any other relevant proof any party offers." *In re Gabriella D.*, 531 S.W.3d at 682. However, "a finding on each factor is not required." *In re Kaylene J.,* No. E2019-02122-COA-R3-PT, 2021 WL 2135954, at *18 (Tenn. Ct. App. May 26, 2021); *see In re Matthew T.*, No. M2015-00486-COA-R2-PT, 2016 WL 1621076, at *16 (Tenn. Ct. App. April 20, 2016) (citing *In re Dominique L.H.*, 393 S.W.3d 710, 719 (Tenn. Ct. App. 2012)).

The first statutory factor is whether Mother "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child[ren]'s best interest to be in the home of the parent or guardian[.]" Tenn. Code Ann. § 36-1-113(i)(1). At the time of trial, Mother did not have a home and was staying with a friend in Minnesota. Mother failed to address her substance abuse issue by failing to complete her second A&D assessment and a second IOP after she exposed the children to methamphetamine during the trial home visit, and by repeatedly using methamphetamine since the children entered DCS custody in March 2018. We find that this factor weighs in favor of termination.

The second statutory factor is whether Mother "has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible[.]" Tenn. Code Ann. § 36-1-113(i)(2). From the children's removal in March 2018 until trial held in March 2021, Mother had three years to effect a lasting adjustment. Mother repeatedly tested positive for methamphetamine, exposed her children to methamphetamine, failed to obtain appropriate housing, and failed to obtain employment and provide verification of that employment. Mother also failed to complete her second A&D assessment and a second IOP, and refused to attend the recommended counseling for her past PTSD. These issues remain after DCS had made reasonable efforts to assist Mother in making a lasting adjustment. DCS gave Mother multiple opportunities to comply with the requirements. DCS also provided for the children's medical, dental, and mental needs, monitored the children's education and daycare needs, provided counseling, offered bus passes to Mother for transportation, assisted with Mother's A&D assessment and her IOP, and helped facilitate visitation. As such, we find that this factor weighs in favor of termination.

The third statutory factor is whether Mother "has maintained regular visitation or other contact with the child[ren.]" Tenn. Code Ann. § 36-1-113(i)(3). Ms. Williams testified that Mother attended supervised biweekly visitation from March 2018 to February 2019, which was the period between removal and the trial home visit. After the trial home visit ended in June 2019 due to Mother's drug use, Ms. Williams set up supervised visits for two months, which Mother failed to attend. Mother then called in August 2019 about supervised visits, and Ms. Williams set up those visits for September. Although Mother attended these, disruptions occurred at each of the three visits. As a result, a no-contact order was entered in October 2019 until Mother could behave. However, Mother was still allowed to contact the children through phone calls. The proof showed that Mother had not participated in in-person visitation since October 2019 due to her own behavior, and she only contacted her children by phone from time to time afterward. Therefore, we find that this factor weighs in favor of termination.

The fourth statutory factor is "[w]hether a meaningful relationship has otherwise been established between [Mother] and the child[ren.]" Tenn. Code Ann. § 36-1-113(i)(4). Ms. Williams testified that although Octavia had expressed interest in going home, she was conflicted because she was afraid Mother has not changed. Ms. Williams testified that the twins do not express anything about Mother. Dr. Wood stated that Mother failed to give the children structure in their lives, and that the children never knew what was expected of them. Dr. Wood also noted that Octavia had admitted that she did not want to be happy in foster care because she was afraid Mother would think she was betraying her. Dr. Wood stated that Mother lacked concern for the children's overall development. We find that the record evinces a lack of a meaningful relationship between Mother and her children. Therefore, we find that this factor weighs in favor of termination.

The fifth statutory factor is "[t]he effect a change of caretakers and physical environment is likely to have on the child[ren]'s emotional, psychological and medical condition[.]" Tenn. Code Ann. § 36-1-113(i)(5). Ms. Williams explained that the twins were stable and bonded with their foster mother, their foster mother loved them, and it would harm them psychologically to have to leave. The twins' foster mother explained that the twins' behavioral issues were minimal now and that the twins were part of the family. As for Octavia, Ms. Williams testified that she was concerned about placing Octavia back in the home with Mother because it was overwhelming for Octavia, and there were concerns about exposure to sexual abuse. Ms. Williams testified that although Octavia had expressed this interest in going home, she was conflicted because of Mother's conduct. Ms. Williams concluded that Octavia was stable in her current placement, she was not moving from home to home, and she was not afraid of people sexually abusing her. Ms. Williams testified that that would change without termination, because Octavia would have hope that she would still get to go home and that may not happen. Therefore, we find that this factor weighs in favor of termination.

- 28 -

The sixth statutory factor is "[w]hether the parent . . . , or other person residing with the parent . . . , has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child[ren], or another child or adult in the family or household[.]" Tenn. Code Ann. § 36-1-113(i)(6). As explained in the ground on severe child abuse, Mother's substance abuse led to three of her children being exposed to and testing positive for methamphetamine during the trial home visit. Additionally, DCS became involved with this family in March 2018 because of drug-exposure and environmental neglect. Ms. Williams also testified that Octavia had been sexually abused in the past by one of Mother's boyfriends. We find that this factor weighs in favor of termination.

The seventh statutory factor is "[w]hether the physical environment of [Mother's] home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent . . . consistently unable to care for the child[ren] in a safe and stable manner[.]" Tenn. Code Ann. § 36-1-113(i)(7). As we have previously discussed, Mother does not currently have a home of her own, and has not had a home of her own since June 2019. After June 2019, Mother went to her sister's home, then to a friend's home, and she now lived in Minnesota with a friend. Additionally, Mother failed to address her substance abuse issue, an issue that previously led to three of her children being exposed to methamphetamine. Therefore, we find that this factor weighs in favor of termination.

The eighth statutory factor is whether Mother's "mental and/or emotional status would be detrimental to the child[ren] or prevent [Mother] from effectively providing safe and stable care and supervision for the child[ren .]" Tenn. Code Ann. § 36-1-113(i)(8). Mother completed both her mental health and WRAP assessments. Mother also completed her psychological evaluation with a parenting assessment in May 2019. However, Mother did not complete her recommended counseling for PTSD because she refused to attend. Mother failed to attend counseling and address her mental health, and therefore, we find that this factor weighs in favor of termination.

The ninth statutory factor is whether Mother "has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101." Tenn. Code Ann. § 36-1-113(i)(9). Mother claimed to hold various jobs during the pendency of this case. Dr. Wood noted that Mother had stated on several occasions that she wanted to start paying child support. However, there was no record of any payments or any arrangements to begin payments. Mother failed to provide any income or support since the children entered DCS custody in March 2018. Mother was aware of her obligation to support her children and the consequences of not doing so, as she signed the DCS form setting forth the criteria and procedures for termination of parental rights. Mother was consistently required and reminded to obtain employment with an income sufficient to provide for her needs and her children's needs. Therefore, we find that this factor weighs in favor of termination.

We conclude by clear and convincing evidence that termination of Mother's parental rights is in the best interest of the children.

## V.    CONCLUSION

For the aforementioned reasons, we reverse the finding that DCS proved by clear and convincing evidence that Mother's parental rights should be terminated due to abandonment by failure to support and abandonment by failure to provide a suitable home, but we affirm the ultimate termination of Mother's parental rights. Costs of this appeal are taxed to the appellant, Betty J. R., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE